Thank you, your honors. May it please the court, Jenny Lyston for Nathaniel Williams. Your honors, we're asking you to reverse the order of civil commitment here because Nathaniel Williams does not meet the statutory criteria for civil commitment under 18 U.S.C. section 4246D. That section permits commitment only where there is clear and convincing evidence that, quote, the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another. Your honors, here the undisputed evidence showed that Mr. Williams was diagnosed with schizoaffective disorder. However, by the time of the hearing, both experts agreed that he was in remission. He was stable and symptom free, and that was because after years of trial and error, he had finally found a medication that worked extremely well for him, one that he enjoyed taking and that rendered, allowed him to live a normal life, and that was the monthly injectable form of Haldol. The court in fact... Can you talk about, just as a factual question, can you start talking about, when I look at J126 in the report, after he's owned the shots of Haldol, he reports that he does not have a mental illness and that he did not require medication all the time, but instead only as needed, right? So this is after he's owned the injection, and he reports to the provider that, I only, you know, I don't require medication all the time. I understand once he gets to trial, once he gets to this proceeding, he says, no, no, I like this, I'll keep doing it, but it seems like in looking for substantial evidence in the record, that's a really hard thing for me to get my head around in the context of your argument because he's basically admitting, I don't really need to keep doing this, right? I'll just stop when I want to because I'm not really sick. So I think that interview takes place pretty early after he has been on the Haldol, Your Honor. Certainly, you're right. By the time we get to the hearing where he testifies in person, he openly acknowledges, absolutely, I do have a serious illness here. Both experts agreed, though, he enjoyed taking the Haldol. It was working well, right? Also, the fact that he took medicines before. What I'm trying to look at though, right, that seems like really hard evidence for you. So I take it you're saying one thing is, oh, well, maybe that statement was early on in the Haldol and the buildup of Haldol changed his views. The problem is there's nothing in the record. I don't know of anything that actually supports that surmise. Is there anything else that you want to say about that particular provision in 176 where he says, yeah, yeah, I'm on Haldol, but I'm not really sick, and I just need medicine whenever I need it, not all the time? So I think what this turns on, Your Honor, is the district court finds that Mr. Williams' dangerousness is contingent on his medication compliance, right, but then goes on and makes no findings on whether, on the likelihood of. I understand that argument. And maybe the answer is no, and that's totally fine, but is there any other context or anything else you want to tell me about his statement after his own Haldol that I don't have a mental illness and I just need medicine when I need it, but not all the time? No, okay, that's fine. I wasn't trying to be difficult. This isn't a trick question. I just want to make sure I understood the context for that statement. Your whole answer is that they are separated in time. Do you know? Can you tell us? Maybe when you sit down you can get back up and say that was said X and this is said Y, because that is your whole argument, right, with respect to that. Right. We're talking about this is a period of eight months later, eight months during which he is completely stable and symptom-free, right? So the district court makes a finding that Mr. Williams' dangerousness is contingent on his medication compliance, but then makes no findings to say that Mr. Williams will not comply with his medication going forward. And, in fact, we know that for at least three years he's absolutely going to have to comply because he is on a term of supervised release. So why is that, right? Because he's been on other supervised release, and maybe you say the state's not as good as the feds on supervised release, but he's been on other supervised release and is not like a model of compliance. When he was on different medications that show that were not very effective for him, right? So he's now on an injectable form of Haldol. Importantly, this is not self-administered, right, Your Honor? He has to be given this. He has to show up, though, right? He has to show up for this injection. There is no scenario under which Mr. Williams doesn't show up for his monthly injection of Haldol that probation is not going to know about it, right? That is an easy phone call. How is probation going to know about it? Because the medical provider would call probation? Absolutely. On the terms of his supervised release, absolutely. They're going to be, and presumably it's either going to be with the ACT community support team that could come to his house as often as need be, but absolutely his medical provider will be in communication. The probation officer is going to be in communication with the medical provider. Do we really, I mean, so as a practical matter, I guess, how do we know that, right? Because oftentimes, you know, probation officers have a really hard job, and they're not quick, I think as a general matter, to yank somebody off or report their supervised release violation for the first infraction or the first time that something doesn't go exactly right. And so, you know, I don't know much about the probation officers in Portland or the relationship. How do we know that he would immediately be, you know, reincarcerated if he failed to show up to get his shot? Well, let's say this. The district court says that if I could impose conditions here, you know, then he's, you know, the district court was comfortable. It wanted to impose conditions but understood that it couldn't impose conditions unless it first committed him. There's nothing special or magical about the commitment court's ability to impose conditions here. They're going to be under the exact same type of conditions. He could require there be, like, immediate, like, arrest. Like, if he fails to show up for his shot, he must be immediately taken to custody, a fact that he does not know about whether that would happen under the supervised release conditions, even for the two years that he's got. Even assuming the two years was the only question we had. I've never seen a conditional release plan like that, Your Honor, that says if he doesn't show up for the shot, he, you know, he shall be immediately arrested. In general, conditional release plans look exactly like the conditions that are already in place for Mr. Williams. You mentioned the district court. I'd like to ask you something about the district court at the end of the hearing that I'm going to ask both of you about. So at the end of this hearing, the district court says, I'm going to order him committed, but I expect there to be a conditional release plan proposed in the near term. What is the status of that? There is none that I know of at the time, Your Honor, because, exactly because of this appeal. So there's no... Wait, I don't see why this appeal would have prevented someone from proposing a conditional release plan in the last X amount of time. Would it make your claim moot if he got a conditional release? Absolutely not. Why not? Because we're arguing here about the district court's initial commitment of Nathaniel Williams, not the ability to later on perhaps put... Take back some of it or lift some of the restrictions. Right, right. So, again, the district court makes this finding. It's contingent on his medication compliance. There's just simply no evidence to show that Mr. Williams is not going to be compliant with his medication regime. Again, both experts agreed he took the medication willingly, he enjoyed the medication, and he is required to take it as a part of that supervised release term. And I would just like to note that there's some debate over here about how long the supervised release term is in effect. Even assuming that the Turner Rule is in effect and he would not be judicially stopped. We're talking about a supervised release term that doesn't expire until mid-December of 2024. So even today... What about if a district court, just hypothetically, right, and I understand you don't think this is the story, but imagine a district court said, listen, I have a fair degree of confidence that for the next two years he is going to comply, but I also am confident that the moment he's off of supervised release that he is going to stop taking his medication and has an extremely high likelihood of committing violent crime if that were to happen. Hypothetical, not your case. I'm not trying to get you to agree with the hypothetical, right? The district court could plainly do that, right, and say there's not a risk for the next two years, but there's a risk in year three that is substantial, that I think is clear and convincing, and so I'm going to order him detained even though the next two years he's going to be okay. Absolutely. Help me understand why not. Because the problem that Congress is trying to solve here, right, the problem that we're looking at is this very unique problem of the federal government being in control of people who are incompetent people whose release may pose a risk, right? And I would urge the court to look at United States v. Comstock. There's a very interesting discussion. No, it will. There's an interesting discussion in there about the court analogizes this situation, this sort of narrow exception, to tort liability. And so when you assume custody over a person, you then have a corresponding duty to the public, other persons, to prevent harm that would be posed by this person. And it talks about, hypothetically, of someone with an infectious disease. When you're talking about a risk of harm that doesn't arise until two years or three years after someone has been released, I mean, that tort liability is extinguished there, right? There's no duty, continuing duty, to protect the public because for years and years in advance, Where do I get that out of the statute? Help me understand how I... All right, so that's an interesting sort of like policy argument, right? But what I'm trying to see is, like, the statute doesn't say a substantial risk within the next two years, right? Or substantial risk of great bodily harm within the next eight months. True, but Congress has written this statute with Supreme Court precedent in mind. Decisions like, you know, Jacksonville, Indiana and the idea that it is a due process violation to keep an incompetent person committed unless they pose a danger, right? That's, I think you're running perilously close to a due process violation when you're talking about not a substantial risk. The statute talks about a substantial risk. All right, but we don't have a due process claim here, right? Like, your claim is not under the due process clause. It's, here's the statute, was it satisfied? Correct. And maybe there's a... At some point, maybe there would be a due process claim, but, like, not here. Our understanding of the statute is it's talking about substantial risk. The substantial risk has to arise as a result of the person presently suffering from the mental disease or defect. So we think what Judge Britt did here was not... he did not base this commitment on substantial risk, but based it only on sort of this contingent future possibility of danger, right? So I know that you definitely don't think the district court... So I definitely understand that you're making a failure to explain, but I want to see if I think you're also making a substantive. So I agree the district court didn't say this, but I want you to imagine the district court had hypothetically said this. Look, the real problem here is I don't know. I guess I know that in the past, when released while on other medications, this individual did not comply. I know that. I know... well, sorry. I think the district court said first, here's what I know. When he's medicated, he's not dangerous. When he is not medicated, he is dangerous. I know... so then this case really comes down to how likely is he to take his medication. I know that in the past when he was on release with other medications, he did not, but those were different medications than those were in the past. I know that he's currently taking his medication voluntarily, but he's doing that in a custodial setting where, candidly, he is aware that if he does not take it voluntarily, he will be forced to take it. He doesn't really have a choice in his current environment, even when he takes it voluntarily. So my real answer is I don't know. The honest answer is if I release this man, will he keep taking his medication? I don't know, and I don't know how it's possible to know under the current situation. If the district court had said that, would that have violated the statute? Yes, Your Honor. I... yes. Okay. And especially when he's disregarding and discounting the supervised release conditions that are in place. He's ignoring the facts on the ground, and the reality is that Mr. Williams is going to be under intense supervision for a week and three years, but possibly two and a half, and that under all of those conditions, there is simply no way that Mr. Williams, one, is going to discontinue his medication, but two, if he does, people are instantly going to know about it, and he will, you know, if he violates any term of his condition, he's subject to reincarceration. Of course, once he's... Didn't the district court suggest, right or wrong, that he didn't believe that Oregon was going to do that, that he would instantly be notified and the problem remedied? I mean, he seemed to call into question whether Oregon would actually do that, right? Well, I believe what he said, Your Honor, was that, you know, I don't know how much of this term has expired, and I don't know of any way that it can be extended. He also said that, you know, I'm not sure that the, you know, the court there and district really has your best interests in mind and the safety of the public in mind, and of course, as we've argued strenuously in our brief, that's absolutely not true. The district court in Oregon was absolutely concerned with Mr. Williams' mental health and the safety of the public, and that's why it puts so many special conditions in place, directly addressing those issues. So, and again, Mr. Williams is going to be in Oregon, so if there's anyone who's going to be concerned about the safety of the public, it's going to be the Oregon court, not the court in North Carolina. Well, shouldn't the court in North Carolina have taken more account of the Oregon court? I do think the Oregon court would not be super happy with the court in North Carolina suggesting that it didn't have Mr. Williams and the public's best interests in mind. I do agree with that. No, no, no, I don't mean Mr. Court rude. What I mean was should the district court have looked at what the Oregon court did, what its result was, and assessed that in making its assessment? Absolutely. I think it should have done that, Your Honor, but it did not. Do you happen to know off the top of your head what page the supervised release conditions are on in the JA? Yes, Your Honor, those are on. Sorry. You know what, and I meant to have it right there, but that is on JA 128. Thank you, ma'am. Yes, sir. I see my time has expired. I will be saving the rest of my time for rebuttal. Thank you. Thank you. Go ahead, Ms. Petrie. Good morning, Your Honors. Jenna Petrie for the United States of America, and may it please the court. The district court did not err on the facts in this case in finding that Nathaniel Williams met criteria for commitment as a mentally ill and dangerous person. We've heard a lot of conversation about the particularized facts in this case, and speaking specifically to some of those facts, there was no dispute in the record that Mr. Williams suffered from a mental disease or defect. Both evaluators diagnosed him. One put him in partial remission, the other in full remission, but the fact remains that he was diagnosed with schizoaffective disorder bipolar type at the time of his commitment hearing. Ms. Petrie, can I ask you about that? I tried to find authority on this, and I couldn't. The parties don't seem to disagree. It says presently suffering from, so that leads to be the question is, is a fully controlled condition a person? So the statute doesn't say does he have schizoaffective disorder. It says presently suffering from, and it wasn't immediately obvious to me that a person whose condition is currently controlled is presently suffering from. Do you have any authority that helps? Again, the parties don't seem to disagree about this, but it appears that I just, when I saw that, I was immediately not sure about the controlled condition person. No, Your Honor. To the best of my knowledge, this has never been raised by this court or any other circuit court that I've been able to locate, this issue of what presently suffering means. Now, of course, the government would offer that presently suffering means having an active diagnosis, which Mr. Williams does in this matter. He has an active diagnosis, whether it's in partial remission or in full remission, I think is a factual dispute in the record whether or not he continued to suffer from auditory hallucinations. Our position would be that he did, that the evidence shows that he did continue to suffer from those. But can I bring you back to something that both of my colleagues mentioned at the end of the previous argument? I mean, I mean this advisedly, and as a former government litigator, I was literally flabbergasted when I read what the district court said about the District of Oregon. So, is of limited duration, well, that's fine. And then the district court says this, is subject to the control of some other court that does not have both your best interest and the mental health of you and others and the safety to the public. I mean, I mean this sincerely. I was flabbergasted when I read that a federal district court had said that about another federal district court. Why is that not legal error all by itself? To the extent the district court suggests, I am not doing this because I do not trust the United States District Court of the District of Oregon to treat you appropriately. Why is that not legal error all by itself? I'll agree, Your Honor, that that could have been better worded. But I think when we look at this... Don't we also include, when he's talking about the court... So I read, maybe I was less flabbergasted. But when I read that, I interpreted the court there to include the probation officer, which works for the court, right? And in that sense, it's expressing some concerns about whether the court as a whole was going to live up to the conditions that are put because it recognizes that there's invariably wiggle room in the violation of supervised release conditions. I read it as being that this isn't a court that's familiar with this kind of, not criminal commitment, but that got a separate category of, yes, you're endangering people and so you're committed, but it's only a civil commitment. I mean, this facility that is in North Carolina is, I think, people from all over the country come to. I would agree with you, Judge Motz. That was also the government's interpretation of what the lower court was trying to iterate. But I think it's entirely possible that it means... Whatever that means. That Portland is some lawless enclave where we just let people go for no reason at all. And many people think that. I think the court made a distinction here when we're looking at what the two courts... Don't quote that, by the way. I think the important distinction when we're looking at what the two different courts did is that the District of Oregon was imposing criminal supervision. But what the lower court here, the Eastern District of North Carolina, is talking about, as Judge Motz aptly pointed out, is something so specific. We are here for the distinct purpose of Mr. Williams' mental health. And so it's not necessarily saying I don't trust the District of Oregon to revoke or I don't trust probation to do this, but that I, as the civil commitment court who understands mental health, who's worked on these cases for a long degree of time and who see these come and go, I know what conditions a person who has a mental illness and who needs to be protected and the public needs to be protected, what conditions to impose. And while... And I agree the district court said that. And the judge also said something at the end of the hearing, which is, government, I'm going to give you your commitment. I expect a conditional release plan like forthwith. Have you done that? Your Honor, so this information is not contained in the record. So it's not before us in the record. However, there were efforts made outside of what's before Your Honor's in this record to create a plan to conditionally release Mr. Williams. As I believe you'll see in the record, the Respondents' Council had proposed a plan that Mr. Williams go and live with his sister. So that plan was further investigated. Again, not in the record, but there were concerns that Mr. Williams did not desire to... But I guess we certainly can take judicial notice of anything that happened in the district court. What the district court judge said, I expect you to present me, the district court, with a conditional release plan because if you present me with one, I will approve it. Has the government done that? The government has not done that at this time. And how long has it been? It has been since April 12th, I believe, Your Honor. Of this year? Of this year, Your Honor. And so as... But you can only submit a plan that the defendant agrees to, right? I mean... Well... You can't force him to live somewhere that he says he will not live. We can't force him to live somewhere that he will not live. And the issue kind of remains, I think, in this case, is whether this would be a conditional release consistent with 4246E, or if this would fall more under either 4246D2 or perhaps even a review hearing under 4247H. And that issue being whether or not the warden would need to certify that the person was appropriate for release. And so further investigation by the evaluator in this case might be needed in order for the warden to come to that determination. Is there any reason... Your colleague suggested that the reason there's no plan is because of this appeal. Is there any reason from the government's perspective to believe that resolving this appeal would encourage or move forward a plan? I certainly believe that the resolution of this appeal, of course, in favor of the government, would move that plan forward. I think I agree with my colleague in saying that this appeal somewhat stayed what was happening in the lower court because, of course, if this court finds that Mr. Williams was not appropriately committed and that clear error was committed, we would either need to be remanded back to another hearing to determine whether or not he meets criteria for commitment, legal issues aside, or he would be released on his two years of remaining supervision, and thus a conditional release plan would no longer be necessary in this case. I think one of the important factors when we're considering Mr. Williams' mental health condition is that we don't just have to look at it in a vacuum, what was presented at the hearing. And, in fact, this court, in an unpublished opinion, but referencing the United States v. Williams from the Eighth Circuit, talked about how we have to look at the person's entire symptom profile, not just the most recent manifestation at the hearing. And so we shouldn't just look at how Mr. Williams was doing at the hearing, but we need to look historically how Mr. Williams has been doing in the past. And I think that this is also one of the most important things when we consider the supervised release conditions as well, because so much happened just between the time that those supervised release conditions were imposed by the District of Oregon in December of 2018 and when Mr. Williams became before the court in April of this year. I mean, we're talking about 36 incident reports, a 42-45 commitment for hospitalization of a mentally ill person who's sentenced, and then the involuntary commitment order, or the involuntary hospitalization order for him to receive care and treatment. And so there's so much more evidence in the record, and we can't just look at this one data point. Can I ask you the question that I tried to follow up with your colleague? The District Court seems to say with respect to the supervised release condition, effectively, there are two reasons why those conditions don't matter. One is the limited duration, and then the other is the musings on the District of Oregon court. Just talking about the first one, would that be a sufficient ground? So imagine we thought that the second was a problem. So we decided the District of Oregon was for some reason improper. Would the limited duration be sufficient? So in other words, if the court determined that going to be great for two years, but as soon as they're all supervised release, there's going to be a substantial risk, is that enough under the statute? I think it is enough, Your Honor, and that's because what 42-46, what Congress created 42-46 to look at, and you'll notice it's not the word imminence because imminence doesn't exist anywhere in the statutory scheme. So we're not looking at the right now. We're trying to predict risk, and in fact, this court has echoed the sentiments of other courts when we talk about this issue. We're looking at trying to determine a person's behavior and whether it evinces a genuine possibility of future harm. And so when we're talking, we have to be talking about future harm, and we have to be talking about predicting risk because this is imprecise. We don't know exactly that, you know, for two years, he'll be great, but in that third year, he's going to really struggle. We have no idea, and that's why we have to look at this whole record. We have to look at every little piece of information that we have. Well, then can I ask you then, because you say this in your brief a lot too, but I see a significant tension. I pulled this up on page 51 where you say we have to look at the whole record except the district court is actually not required to consider supervised release, and would you help me see why there is not a tension between saying, you know, look, the district court can't look at pieces of evidence in isolation, we have to look at the whole scope of it, except then on page 51 of your brief, you said the district court is allowed to completely disregard the entire existence of the supervised release. How is that possibly true? Well, I apologize, Your Honor, if it came across that way. I certainly don't mean to imply that the district court should ignore any piece of evidence in this case, and in fact, I think Dr. Muckin, the government's evaluator, really talks about all of the evidence, the protective and the risk factors. What I mean to say is that there are really three criteria that we have to look at when we talk about whether or not a person should be committed under 4246. It's their mental condition, whether that creates a substantial risk of dangerousness, and whether state placement is available. Those are the three things that we know that the court has to look at. But as this court held in United States v. Cox and United States v. Ecker, we have to look, again, at that totality and we have to look at the things that evaluators typically look at. And one of those things in this case was the supervised release. But nothing in the statutory scheme requires us to take that into full consideration or give it more weight than any other factor. And so I don't think the fact that he has three years or perhaps now two years of supervised release, according to the Ninth Circuit, should be the most important factor in this case. And in fact, this court in other cases, specifically in United States v. Bell, a 4248 commitment affirmed a person's commitment when he had lifetime supervision. And so this one factor can't be the factor that we hang our hat on. Is it different? When we talk about considering supervised release, is it different than considering the conditions in which someone being released would live? We often think about district courts saying, listen, we think he can be released because he has a stable home to go to, his parents are happy to have him, that's a place that he's comfortable. That's something that might reduce the risk. And you might think that supervised release of a limited duration might reduce the risk for that in sort of a similar manner. Is that the type of analysis we're looking at? I think it's certainly possible to make that analysis. But what I would posit to this court is that when we're talking about a conditional release, or if we're just talking about the risk factors that the two evaluators in this case considered, they are looking at where is he going to go, where is he going to live, what family support does he have, and what things are available to him that we can ensure that he has success. And not to compare and contrast too greatly the supervised release to a conditional release, or the supervised release to his risk factors, but we look at those things, and there were so many unknowns. My colleague talked about an ACT team, an assertive community treatment team being possible, but we see in the records that one isn't actually set up for him. It's actually not included in the supervised release. And so how do we ensure that a person who has such a troubled history, who is a very young man still, but who has such this troubled history of acting out aggressively towards family, towards indiscriminate others, strangers on the street, in such a violent manner, and then preceding that into the structured environment of the Bureau of Prisons, and racking up 36 incident reports between, I believe, May of 2019 and May of 2021, this is an incredibly short period of time to just do so much. And so, no, I don't think it's a compare and contrast, and I don't think it's necessarily that one is better in the long term than the other, but Mr. Williams only has two years left of supervised release. And it's simply, as the Court said, it's not the duration or the ability or the focus that Mr. Williams really needs to be successful in this case. As I mentioned, I think we need to look at the entire behavioral and psychiatric profile of Mr. Williams. I think when you do that, when you consider all of the evidence, the ongoing auditory hallucinations, the mental health treatment, the commitment order, the involuntary nature of his medication, and the fact that there's certainly no guarantee that he would continue that medication in the community, whether he's supervised by probation or not, and the substance abuse, the fact that he's never received substance abuse treatment, his weapons use, and just his history of acting aggressively when psychotic, I think all of this evidence supports the final conclusion of the District Court in this case. And so unless the Court has any other questions, I would rest on the government's brief and ask that this Court affirm the findings of the District Court. Thank you, Your Honors. Thank you, Your Honors. Judge Heintz, I wanted to come back to a couple of questions that you posed to my friend on the other side. First was this government argued at the hearing, and the Court puts into its order at JA-161 that, you know, you shouldn't think about the supervised release terms at all. They simply shouldn't be factored into this consideration, and it's unclear. Part of the Court's order that troubles me is that it is unclear from the Court's order whether it felt that it was just going to need to discount these supervised release terms altogether because it felt like it had to evaluate this in a vacuum and not consider those, or whether or not it just didn't the Court felt like those terms were not going to be sufficient. And so I do think that's a troubling aspect. I want to emphasize again a conditional release plan. The commitment court in North Carolina actually has less ability and less authority than the to tailor conditions for Mr. Williams because its authority is restricted to placing Mr. Williams on a prescribed treatment regimen, right? Those are the kind of conditions that the commitment court can impose. The district court in Oregon on the other hand can impose and modify any condition on Mr. Williams. So again, we think the district court in Oregon was far better suited to come up with any sort of conditions that Mr. Williams needed and in fact did. And again, we were already working with the public defender in Oregon. Mr. Williams already has a probation officer in Oregon who is well aware of the situation and can take every precaution necessary to ensure that his release does not pose a risk. And again, when we're talking about, I think there's what is so dangerous about this opinion and why it's dangerous to affirm this is this idea that we're instead of basing commitment on substantial risk based on the person's present suffering from his mental illness, we're going to instead base it on contingent future risk only. We just don't think that that is what the... Isn't substantial risk, I mean in the very definition in the statute, a contingent future risk, right? That very point of substantial risk, risk is about contingent possibility. We're not saying, presumably if in the courtroom he beat up the bailiff, that would be probably pretty good evidence, but it would only be evidence that he would do it next time. Even that beating up the bailiff in the courtroom during the hearing would be relevant because it tells us something about the risk of release, which is the future possibility. And I don't disagree with you, Judge Richardson. There is some future, obviously it has to be to a certain degree. It's only future. Only future. The release hasn't happened yet. Right. So obviously we're talking about the future. But how far into the future does this... are we talking about? One of the reasons I submitted the 28J letter with the North Carolina opinion, I just thought it was interesting that if... they definitely limit it to within the near future, right? Because, again, if Mr. Williams... Totally fair, but write your congressman, right? I mean, that might be a really good idea to say, is it a substantial risk within the next five years or two years or one year? So I think if we're talking about risk that far out, then we are moving away from 42-40-60's language that the substantial risk has to arise from the present suffering. And Judge Heidens, I would also note that I do think it is interesting that whether or not someone is said to be presently suffering, we do agree that we believe that you have to have active symptoms. And our trial attorney argued that quite a few times. But I will also agree with my colleague that there is simply no case law on that particular aspect. And we believe that it more goes to the substantial risk has to be tied to the presently suffering. I think if the person is at the initial commitment, if that person is already recovered from their mental illness to such an extent that the district court is talking about conditional release, I don't think they qualify for initial commitment. Because 42-46-D doesn't talk about conditional release at all. That's only after initial commitment. So I think the trial court sort of erred here in jumping the gun and looking ahead and not focusing on the statutory criteria for initial commitment under 42-46-D, but instead sort of leaped ahead and was looking to D-1 and D-2 and to revocation proceedings. I see that I am out of my time. Your Honors, if there are no further questions, we respectfully request that this court reverse the order of commitment. Thank you, Your Honors. Thanks very much. We appreciate your argument. As we probably both know, we usually come down and greet counsel, but we can't do that this time. But we do appreciate your argument.
judges: Diana Gribbon Motz, Julius N. Richardson, Toby J. Heytens